# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:24-cv-1154-RMR-MDB

JALLEH DOTY and JEFFREY OGDEN,
individually and on behalf of all others similarly situated,

     *Plaintiffs*,

v.

QUANTUM METRIC, INC.,

     *Defendant*.

---

## DEFENDANT QUANTUM METRIC, INC.'S
## MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR LACK OF STANDING

---

sf-5981056

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    BACKGROUND .............................................................................. 2

    A.    **How CVS Uses Quantum's Platform** ........................................ 2

    B.    **Quantum Encrypts PII Entered on CVS's Website** .............................. 3

    C.    **Quantum Cannot Use IP Addresses to Identify Individuals** ............... 4

III.   LEGAL STANDARD ........................................................................ 6

IV.    ARGUMENT ................................................................................... 6

    A.    **Plaintiffs Fail to Allege Any Tangible Injury** ........................... 7

    B.    **Plaintiffs Have Not Suffered a Traditional Privacy Harm** ................... 8

        1.    **Plaintiffs cannot establish that Quantum captured their data in a "deanonymized" manner from CVS's website** ........... 9

        2.    **Plaintiffs lack any basis to allege that Quantum captured their medical information in a "non-anonymized" format** ...... 11

        3.    **Plaintiffs cannot substantiate their bare allegation that Quantum shares data with third-parties** ................................. 13

V.     CONCLUSION ............................................................................... 14

i

sf-5981056

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. PSP Grp., LLC*,
    691 F. Supp. 3d 1031 (E.D. Mo. 2023) ........................................................................ 14

*Addi v. Int'l Bus. Machines, Inc.*,
    2024 WL 2802863 (S.D.N.Y. May 31, 2024) ................................................................ 14

*Baker v. USD 229 Blue Valley*,
    979 F.3d 866 (10th Cir. 2020) ........................................................................................ 7

*In re BPS Direct, LLC*,
    2023 WL 8458245 (E.D. Pa. Dec. 5, 2023) .................................................................. 13

*Byars v. Sterling Jewelers*, Inc.,
    2023 WL 2996686 (C.D. Cal. Apr. 5, 2023) ...................................................... 9, 11, 13

*Cook v. GameStop, Inc.*,
    689 F. Supp. 3d 58 (W.D. Pa. 2023) ........................................................................... 13

*Farst v. AutoZone, Inc.*,
    2023 WL 7179807 (M.D. Pa. Nov. 1, 2023) ................................................................... 7

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................................................ 7

*Hernandez v. Noom, Inc.*,
    2023 WL 8934019 (D. Md. Dec. 27, 2023) .................................................................. 14

*I.C. v. Zynga, Inc.*,
    600 F. Supp. 3d 1034 (N.D. Cal. 2022) .......................................................................... 7

*Laufer v. Looper*,
    22 F.4th 871 (10th Cir. 2022) ......................................................................................... 6

*Lightoller v. JetBlue Airways Corp.*,
    2023 WL 3963823 (S.D. Cal. June 12, 2023) ................................................................ 9

*Maser v. Commonspirit Health*,
    2024 WL 2863579 (D. Colo. Apr. 16, 2024) .................................................................. 8

*Massie v. Gen. Motors LLC*,
    2022 WL 534468 (D. Del. Feb. 17, 2022) ...................................................................... 9

sf-5981056

*Mikulsky v. Noom, Inc.*,
    682 F. Supp. 3d 855 (S.D. Cal. 2023)..............................................................................9

*New Mexicans for Bill Richardson v. Gonzales*,
    64 F.3d 1495 (10th Cir. 1995) ........................................................................................6

*Nienaber v. Overlake Hosp. Med. Ctr.*,
    2024 WL 2133709 (W.D. Wash. May 13, 2024)..........................................................12

*Nova Health Sys. v. Gandy*,
    416 F.3d 1149 (10th Cir. 2005) ......................................................................................6

*Popa v. PSP Grp., LLC*,
    2023 WL 7001456 (W.D. Wash. Oct. 24, 2023)...................................................... 13-14

*Stine v. Lappin*,
    2009 WL 103659 (D. Colo. Jan. 14, 2009)......................................................................7

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).............................................................................................*passim*

**Statutes & Rules**

Cal. Civ. Code § 1798.140(ag)(1) ........................................................................................ 11

Fed. R. Civ. P. 12(b)(1) .................................................................................................... 1, 6

45 C.F.R. § 160.103 ............................................................................................................ 11

sf-5981056

Defendant Quantum Metric, Inc. moves to dismiss Plaintiffs Jalleh Doty and Jeffrey Ogden's Complaint (ECF No. 1) under Fed. R. Civ. P. 12(b)(1) as follows:

## I.    INTRODUCTION

Plaintiffs' lawsuit is one in a litany of similar putative class actions brought against web analytics companies and/or their customers.  Each of these lawsuits allege that the use of "session replay" technology violates various wiretapping laws, including the two state laws at issue here: California's Invasion of Privacy Act (CIPA) and Pennsylvania's Wiretapping and Electronic Surveillance Control Act (WESCA).  Courts have repeatedly rejected the theory that a mere statutory violation under these laws, absent some concrete privacy injury, can constitute an injury-in-fact for Article III standing.  But that is what Plaintiffs attempt here—litigating statutory violations devoid of *any* injury, whether privacy-based or otherwise.

Plaintiffs' claims arise out of non-party CVS's use of Quantum's session replay feature—a web analytics technology that allows CVS to understand and improve how its website functions, while keeping the identity of its website visitors totally anonymous to Quantum.  Indeed, any personally identifying information (PII) entered by a website visitor on CVS's website is encrypted, field by field, before leaving the visitor's device.  As a result, there is no way for Quantum to tie a "session"—a reconstruction of a website visitor's time on CVS's website—to an individual internet user.  For example, if a website visitor adds Advil to their cart and enters identifying information while checking out, all PII (*e.g.*, name, email address, shipping and billing address, and phone number) will be represented as a series of hash marks (####) in the session replay.  Only CVS can decrypt the website visitor's identity and reveal what is behind the hash marks.  Thus, the central premise of Plaintiffs' lawsuit is simply wrong:  Quantum does

1

sf-5981056

*not* capture Plaintiffs' "sensitive" data, and it certainly does not do so in a "deanonymized manner."

Courts faced with CIPA and WESCA lawsuits similar to this one have consistently held that, absent the disclosure of *personal* information, there is no Article III standing.  The Court should reach the same conclusion here.  Quantum's platform anonymizes individuals, which means Plaintiffs have brought a privacy lawsuit without an actual privacy injury.  Given that Plaintiffs lack any other concrete injury sufficient for Article III standing, the Complaint should be dismissed, with prejudice.

## II.     BACKGROUND

### A.     How CVS Uses Quantum's Platform

Quantum is a Software as a Service (SaaS) company that offers its customers—other businesses—a digital analytics platform to help monitor and improve the functionality of their websites.  (Quantum's Appx., pp. 4-9 ("Trattner Decl.") ¶ 2; *see also* Compl. ¶¶ 15, 18, 39.)  As a part of that platform, Quantum offers a session replay feature, which allows customers, like CVS, to recreate visitors' interactions on their webpages.  (Trattner Decl. ¶ 2.)  CVS uses Quantum's session replay feature to, among other things, discover and resolve technical issues that might frustrate the way website visitors experience CVS's website.  (*Id.* ¶ 3.)  For example, session replay helps resolve things like broken links or confusing webpage design that might impede a visitor's ability to complete a web transaction.  (*Id.*)  By identifying points of friction, Quantum's session replay feature helps CVS create a better user experience for website visitors.  (*Id*.)

Quantum's session replay feature does not "eavesdrop[]" on or "record[]" CVS's users.  (*Contra* Compl. ¶ 44.)  Rather, the feature operates through a script (or lines of code) that Quantum's customers are responsible for deploying on their websites.

2

sf-5981056

(Trattner Decl. ¶ 4.)  Once a customer, like CVS, deploys the session replay code on a given webpage, the code will run during a visit to that webpage.  (*Id.*)  The code collects "event" data—*e.g.*, dragging the mouse across the screen, clicking on an element of the page, typing into a text field, clicking into another page, or clicking on a product.  (*Id.*; *see also* Compl. ¶ 18.)  That event data is transmitted directly from the website visitor's browser (*e.g.*, Google Chrome) to CVS's password-protected environment on Quantum's servers.  (Trattner Decl. ¶ 4.)  In other words, the data is transmitted directly from the website visitor's browser to Quantum's servers for analysis, with the sole purpose of being provided to the website owner, *i.e.*, CVS.  (*Id.*)  Using that event data, Quantum's session replay feature can reconstruct a given "session," which can be a portion of or the entirety of the website visit depending on how CVS configures the feature on its website.  (*Id.* ¶ 5.)  But the session replay is just a reconstruction, not a replay of a recording.  (*Id.*)

### B.    Quantum Encrypts PII Entered on CVS's Website

Quantum's session replay feature ***does not*** capture PII in a deanonymized manner.  (*Contra* Compl. ¶¶ 35, 48.)  Quantum universally implements a series of privacy-protective steps in its session replay code that prevent Quantum from having access to website visitors' personally identifiable information (PII).  (Trattner Decl. ¶ 6.)  Quantum requires that any PII entered by a website visitor is end-to-end encrypted on that website visitor's device (*i.e.*, their computer, phone, or tablet) before it can be transmitted to Quantum.  (*Id.* ¶ 7.)  The PII arrives at Quantum's servers in an encrypted format, it is stored in an encrypted format, and it is displayed in a session as a series of hash marks (#####).  (*Id.*)  Quantum is not able to collect, access, or disclose any such PII because Quantum is not able to decrypt the data (*i.e.,* reveal what is behind the

3

hash marks).  (*Id.*)  Only Quantum's customers (here, CVS) hold the decryption keys for data captured on their respective websites.  (*Id.*)

Quantum requires that name, mailing address, email address, phone number, username, or any other information that can be used to identify an individual is encrypted.  (*Id.* ¶ 8.)  Quantum also requires that its customers block credit card numbers, social security numbers, and government-issued identification numbers from capture, if requested on their websites.  (*Id.*)  The likelihood of error from Quantum's PII encryption protocol is significantly reduced for the simple reason that Quantum, as a failsafe, encrypts all information that a website visitor types on a webpage—if that information is collected by its customers—before it reaches Quantum's servers.  (*Id.* ¶ 9.)  The graphic below, which is publicly available on Quantum's website, illustrates this three-step encryption process:



(Quantum's Appx., pp. 14-15.)

Because Quantum encrypts all PII, it has no method of determining who is filling or refilling a prescription, looking at a picture (*e.g.*, a picture of Sun Bum, ChapStick, or Sudafed), or who navigated to a given product page (*e.g.*, product page for Purell, Band-Aid, or Xanax), or why.  (Trattner Decl. ¶ 10.)

### C.    Quantum Cannot Use IP Addresses to Identify Individuals

4

sf-5981056

An IP address is a string of numbers grouped into quartets (*e.g.*, 192.158.1.38) that is transmitted with every web interaction.  (Trattner Decl. ¶ 12; *see also* Compl. ¶ 27.)  Quantum cannot tie an IP address to an identifiable person because it has no PII (name, username, email address, credit card number, etc.) to link the IP address to and it does not purchase any third-party datasets that might allow it to match IP addresses to PII.  (Trattner Decl. ¶ 12.)  Quantum's business practices also prevent Quantum from linking an IP address to PII.  (*Id.*)  For example, Quantum does not need any individual website visitor's PII when it is providing customer support because the issues that arise are typically at the webpage level, rather than with any individual user session.  (*Id.*) Therefore, Quantum prohibits its employees from asking for or accepting a customer's decryption key and Quantum asks that its customers provide similar guidance to their employees.  (*Id.*)

But even without these steps, Quantum still could not use an IP address to identify an individual for at least three other reasons:

   i.   IP addresses are typically assigned at random by a Dynamic Host Configuration Protocol (DHCP) server, which will reassign an IP address over time causing what was once a match—*e.g.*, that 192.158.1.38 is John Doe—to become a false match.

   ii.   Internet users rely on Virtual Private Networks (VPNs) to mask their actual IP addresses and route their data through alternative IP addresses.  Thus, John Doe may be 192.158.1.38 on one day, 192.172.6.47 on another, and a slate of other IP addresses for as long as the VPN is turned on.

   iii.   Home, office, and other networks typically use Network Address Translation (NAT), which assigns a single public IP address for all devices on the network.  When any of the devices on that network communicate with a website, they appear under that same public IP address.  That means it is virtually impossible to conclude that a given web session belongs to John Doe rather than Jane Doe, or Colleague 1 rather than Colleagues 2, 3, or 4.

5

sf-5981056

(*Id.* ¶ 13.)  Quantum therefore cannot identify Plaintiffs via IP address.  (*Id.* ¶ 14.)

## III.    LEGAL STANDARD

A court has subject matter jurisdiction only if the plaintiff has Article III standing to bring the claims alleged.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  To establish Article III standing, plaintiffs have the burden of showing they (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct, and (3) that a favorable judgment will redress their injury.  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).  "A party filing a 12(b)(1) motion may challenge the court's subject-matter jurisdiction through a facial or factual attack."  *Laufer v. Looper*, 22 F.4th 871, 875 (10th Cir. 2022).  "A facial attack assumes the allegations in the complaint are true and argues they fail to establish jurisdiction," while a "factual attack goes beyond the allegations . . . and adduces evidence to contest jurisdiction."  *Id.* (citation omitted)  "Rule 12(b)(1) motion[s] can challenge the substance of" allegations by "relying on affidavits" and "other evidence properly before the court."  *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995).[1]

## IV.    ARGUMENT

An injury-in-fact for the purposes of standing must be "concrete, particularized, and actual or imminent."  *TransUnion*, 594 U.S. at 423.  "To be 'concrete,' an injury must be 'real' rather than 'abstract.'"  *Laufer*, 22 F.4th at 876 (citation omitted).  For statutory claims like CIPA and WESCA, there is no Article III standing absent "plaintiff's suffering [of] concrete harm" because of "defendant's violation of" the statute.  *TransUnion*, 594 U.S. at 426-27.  Here, Plaintiffs allege two kinds of purported injuries:

---

[1] Thus, Quantum's motion to dismiss should not be converted to a motion for summary judgment.  *Id.; see also* RMR Civ. Practice Standard 7.1B(c).

6

(i) tangible harms related to the risk of identity theft (Compl. ¶ 22); and (ii) intangible harms based on an invasion of privacy (*id*. ¶ 87).  The first is speculative based on a facial reading of the Complaint, and both are factually unsupportable.  *See Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020) (on a 12(b)(1) motion to dismiss, both a "facial" and "factual" attack are permitted).  Plaintiffs are left with no concrete harms necessary for standing.

### A.    Plaintiffs Fail to Allege Any Tangible Injury

Plaintiffs have not identified any "actual" or "imminent" physical, economic, or property harm.  *TransUnion*, 594 U.S. at 423; (*see also* Compl. ¶¶ 77-78, 90, 97.)  Plaintiffs' only allegation of tangible injury is that "third-party replay scripts *may* cause" information like "medical conditions" and "credit card details" to "leak to [a] third-party," which "*may* expose users to identity theft, online scams, and other unwanted behavior." (Compl. ¶ 22 (emphases added).)  But allegations of what *may* occur are too "speculative" to support Article III standing.  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (alleged injury "must be actual or imminent" rather than "speculative" to establish standing); *see Stine v. Lappin*, 2009 WL 103659, at *13-14 (D. Colo. Jan. 14, 2009) (allegations based on future events are "too speculative and remote to assert a cognizable injury").

Indeed, Plaintiffs nowhere allege that their session replays *have* leaked, that they *have* suffered identity theft, that they *are* subject to online scams, or that they *are* subject to "other unwanted behavior" (whatever that means).  *See I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1052 (N.D. Cal. 2022) (no standing based on susceptibility to future fraud because harms are "too conjectural"); *Farst v. AutoZone, Inc.*, 2023 WL 7179807, at *5 (M.D. Pa. Nov. 1, 2023) (no concrete injury from "hypothetical risk of

7

sf-5981056

identity theft" because it depends on "speculative, future actions of an unknown third-party" (citations omitted)).  Nor can they.  As explained, Quantum encrypts all PII. (*See supra* Section II(B)-(C); *see also infra* Section IV(B)(1)-(2).)  In other words, Quantum has nothing harmful to "leak."  (*Contra* Compl. ¶ 22.)  Plaintiffs' alleged tangible harms—future risk of identity theft, online scams, or the amorphous "other unwanted behavior"—are therefore facially implausible and factually unsupported.

### B.      Plaintiffs Have Not Suffered a Traditional Privacy Harm

*TransUnion* is clear that a bare statutory violation, without more, is not enough to establish Article III standing.  *TransUnion*, 594 U.S. at 427.  For statutory claims to proceed in federal court, plaintiffs must establish an accompanying "concrete" injury, which can be tangible or intangible.  *Id.* at 414, 425.  Where plaintiffs fail to allege a tangible harm (as here) a court must assess whether there is an intangible harm sufficient to find Article III standing.  *Id.* at 417.  Under *TransUnion*, an intangible harm satisfies Article III's "concrete injury" requirement only if the as-pled injury bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."  *Id.* at 425; *see Maser v. Commonspirit Health*, 2024 WL 2863579, at *4 (D. Colo. Apr. 16, 2024) (inquiring "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury" (citation omitted)).  As *TransUnion* explains, statutory claims that sound in privacy but fail to pose a traditional privacy injury do not confer Article III standing.  594 U.S. at 434 (violation of the Fair Credit Reporting Act was unlike a traditional privacy tort because the alleged conduct was like writing a "defamatory letter" but "then stor[ing] it in [a] desk drawer").

Following *TransUnion*, courts evaluating CIPA and WESCA claims have held that only the **disclosure** of **personal** information can establish Article III standing.  *See*

8

*Byars v. Sterling Jewelers*, Inc., 2023 WL 2996686, at *3 (C.D. Cal. Apr. 5, 2023)
(rejecting argument that "any violation of CIPA necessarily constitutes an injury in fact
without" an "additional showing of harm"); *Mikulsky v. Noom, Inc.*, 682 F. Supp. 3d 855,
864 (S.D. Cal. 2023) (mere acquisition of "personal information in text fields" like "email
address or phone number" insufficient to establish standing for CIPA claim); *Massie v.
Gen. Motors LLC*, 2022 WL 534468, at *5 (D. Del. Feb. 17, 2022) (dismissing WESCA
claim for lack of standing where "possession of anonymized, non-personal data" did not
"harm[] . . . privacy interests in any way"); *Lightoller v. JetBlue Airways Corp.*, 2023 WL
3963823, at *4 (S.D. Cal. June 12, 2023) (same for CIPA claim where "personal"
information not captured).  Just like these CIPA and WESCA lawsuits, Plaintiffs have
not established that they suffered any cognizable privacy injury necessary for Article III
standing.  Contrary to Plaintiffs' allegations: (i) Quantum does not capture
"deanonymized" information (*Contra* Compl. ¶ 87); (ii) Quantum does not capture
"sensitive medical information" (*contra id.* ¶¶ 22, 35); and (iii) Quantum does not
disclose that information to "third parties" (*contra id.* ¶ 42).  Apart from being conclusory,
these allegations are controverted by public information (including information Plaintiffs
themselves cite) and the declaration of Quantum's Chief Operating Officer.

### 1.    Plaintiffs cannot establish that Quantum captured their data in a "deanonymized" manner from CVS's website

Plaintiffs' claim that Quantum captures data in a "deanonymized" manner is false
and contradicted by their own Complaint.  (Compl. ¶ 35.)  Quantum's webpage on data
privacy and security—which Plaintiffs cite in Paragraph 24, n.9 of the Complaint—
explicitly states the opposite: "To protect [PII] from any exposure, and to also assist our
customers to stay compliant with [privacy laws], Quantum Metric . . . separates[s] any

9

PII data that can be used to re-identify a user[.]"  (Quantum's Appx. p. 13.)  "This PII data is then separately encrypted, using a strong public/private key pair encryption unique to you [*i.e.*, Quantum's customers], before being transmitted to Quantum Metric's servers."  (*Id.*)  Because the PII is also received and stored in an encrypted format, the PII would be displayed as a series of hash marks (#####) if Quantum were to view a session.  (Trattner Decl. ¶ 7.)  Quantum is not able to decrypt the data (*i.e.,* reveal what is behind the hash marks) because only CVS holds the decryption keys. (*Id.*)

Plaintiffs' alternative theory—that IP addresses can be used to identify individual website visitors—is also meritless.  (*Contra* Compl. ¶¶ 31, 51, 56.)  It is impossible for Quantum to identify Plaintiffs (or anyone else) via IP address because:

(i) Quantum cannot tie an IP address to an identifiable person because it does not have name, username, email address, credit card number, or any other PII;

(ii) Quantum does not purchase any third-party datasets that might allow it to match IP addresses to PII;

(iii) Quantum prohibits its employees from asking CVS (and other customers) for their decryption keys, and Quantum asks that its customers provide similar guidance to their employees;

(iv) IP addresses are assigned at random, which means the same IP address may not match the same person across time;

(v) Internet users use VPNs that mask and replace their true IP addresses; and

(iv) A public IP address is assigned per network, meaning a website would see the same IP address for multiple people at home, at the office, or, as Plaintiffs concede, on a college campus.

(*See supra* Section II(C); *see* Trattner Decl. ¶¶ 12-13; *see also* Compl. ¶ 32.)  Nothing in the Complaint is to the contrary.  While Plaintiffs allege, generally, that IP addresses *can* be used by *some* businesses for targeted advertising (Compl. ¶¶ 31-34), none of

10

sf-5981056

their sources involve Quantum.  Quantum does not engage in any targeted advertising.

(Trattner Decl. ¶ 2.)  Nor does Quantum need to identify individual internet users to

provide CVS webpage-level support and, therefore, does not need any individual

website visitor's PII.  (*Id.* ¶¶ 6, 12.)  Given Quantum does not collect "any specific

personal information" implicating "a protectable privacy interest," Plaintiffs lack a privacy

injury sufficient to establish Article III standing.  *Byars*, 2023 WL 2996686, at *3.

    **2.**    **Plaintiffs lack any basis to allege that Quantum captured their
medical information in a "non-anonymized" format**

Plaintiffs' general allegations that Quantum captured information on

"prescriptions" and drug "searches" in a "non-anonymized manner" are wrong.  (Compl.

¶¶ 5-6, 48-51.)  Quantum encrypts *all* typed data fields so that any PII would still be

inaccessible, and any "medical information" would remain anonymized.  (*Id.* (encrypted

data displays as a series of hash marks).)[2]

Plaintiffs acknowledge that Quantum and CVS implement these privacy

protocols.  (*See* Compl. ¶ 24 ("[e]ach website operator" selects "whether information

should be captured [or] not captured.").)  Their only rebuttals are that the process

happens "manually" and is "imperfect" because: (i) Quantum can see the name of the

CVS user's account and (ii) drug information is being captured through the URL value.

---

[2] Though Quantum is siloed from PII entered on its customers' websites, it is
entirely lawful for service providers to receive consumer data in furtherance of a
business purpose.  *See* Cal. Civ. Code § 1798.140(ag)(1) (defining service providers
under the California Privacy Rights Act as entities that "receive" and "process"
consumers' personal information on behalf of a business).  That is a basic precondition
to providing web analytics services. ██████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████

sf-5981056

(Compl. ¶¶ 23-25, 49-51.)[3]  Neither establishes Quantum's access to medical information in a "non-anonymized format."  (*Contra* Compl. ¶ 51.)

*First,* under no circumstances can Quantum see usernames when a website visitor signs into CVS's website.  (*Contra id.* ¶ 25.)  As set forth above, Quantum universally encrypts all PII entered on CVS's website.  (*See supra* Section (II)(B)-(C).)  Plaintiffs' erroneous allegation is presumably based on the greeting, "Hi, Sophia!" in a screenshot of CVS's "Xanax" page.  (Compl. ¶ 24.)  But Plaintiffs' screenshot demonstrates what a *website visitor* sees while browsing—not what *Quantum* sees when it reconstructs a session.[4]  Quantum's PII encryption would "hash" the name Sophia to ######.  (*See* Trattner Decl. ¶ 7.)  Only CVS would be able to decrypt the hashmarks to reveal the name.  (*Id.*)

*Second*, because all sessions are anonymized (*see supra* Section (IV)(B)(1)-(2)), it is irrelevant that Quantum can see a product page for "Sudafed" or a URL with the word "Xanax."  (Compl. ¶¶ 24, 48-51.)  A URL alone, detached from any PII, does not tell Quantum *who* is searching (or why).  (Trattner Decl. ¶ 10.)  All Quantum can deduce is that a "Xanax" page exists and that some anonymous person visited it.  That basic conclusion does not support a privacy injury.  *See Nienaber v. Overlake Hosp. Med. Ctr.*, 2024 WL 2133709, at *3, *5 (W.D. Wash. May 13, 2024) (no PHI disclosed

---

[3] "Manually" is incorrect; the blocking is systematic because the code is configured to "automatically" block information in set fields.  (*See* Quantum's Appx. p. 13; *see also id.* ("[W]e work closely with your team to make sure that any additional content you wish not to be captured, is configured to be ignored by the Quantum Metric parser, and is never transmitted to Quantum Metric's servers.").)

[4] Plaintiffs do not explain who "Sophia" is or whether she took the screenshot included in the Complaint, and, if not, how they obtained this screenshot.

sf-5981056

where the data did not "connect a particular user to a particular healthcare provider" but only related to "the URLs, or the content of [web]pages" (citation omitted)).

### 3. Plaintiffs cannot substantiate their bare allegation that Quantum shares data with third-parties

Plaintiffs' claim that Quantum discloses website visitor data to third-parties is belied by their Complaint and Quantum's encryption protocols. Specifically, their allegation that Quantum offers integrations with Google Analytics and Adobe Analytics that result in the unauthorized disclosure of PII (Compl. ¶¶ 42-43, 52) fails for three reasons. *First*, Plaintiffs only generally allege that Quantum discloses website visitors' PII to third-parties—they do not allege that their own information was disclosed. *Second*, Quantum's customers must voluntarily opt in to these integrations, such that Quantum does not act outside their direction. (Trattner Decl. ¶ 15.) *Third*, and more fundamentally, Quantum cannot share website visitors' PII with third-parties because it does not have access to it in the first place. (*See supra* Section IV(B)(1).)

Given that Quantum does not collect or disclose *any* PII, Plaintiffs are incapable of identifying an injury that bears "a close relationship" to a traditional privacy harm. *TransUnion*, 594 U.S. at 425; *see also In re BPS Direct, LLC*, 2023 WL 8458245, at *15 (E.D. Pa. Dec. 5, 2023) (explaining "anonymiz[ation]" and "encrypt[ion]" were "crucial" in dismissing CIPA and WESCA claims for lack of standing); *Byars*, 2023 WL 2996686, at *4 (no standing for CIPA claim where defendant did not have access to personal information); *Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58, 66 n.2 (W.D. Pa. 2023) (dismissing WESCA claim for lack of standing because the plaintiff's "browsing activity" was "anonymous"); *Popa v. PSP Grp., LLC*, 2023 WL 7001456, at *5 (W.D. Wash.

13

sf-5981056

Oct. 24, 2023) (same where session replay provider could not connect data to plaintiff's identity).[5]

## V.    CONCLUSION

Plaintiffs' Complaint should therefore be dismissed.

Dated:  July 15, 2024

MORRISON & FOERSTER LLP

By: */s/ Purvi G. Patel*
    Purvi G. Patel
    PPatel@mofo.com
    Erik Manukyan
    EManukyan@mofo.com
    707 Wilshire Boulevard, Suite 6000
    Los Angeles, California  90017-3543
    Telephone:    213.892.5200
    Facsimile:    213.892.5454

Elisabeth Hutchinson (CO SBN 46569)
EHutchinson@mofo.com
4200 Republic Plaza
370 Seventeenth Street
Denver, Colorado 80202-5638
Telephone:    303.592.1500
Facsimile:    303.592.1510

Elizabeth L. Arbatman
larbatman@mofo.com
425 Market Street
San Francisco, California 94105-2482
Telephone:    415.268.7000
Facsimile:    415.268.7522

***Attorneys for Defendant
Quantum Metric, Inc.***

---

[5] Courts considering claims under analogous state wiretapping statutes have followed suit.  *See, e.g.*, *Hernandez v. Noom, Inc.*, 2023 WL 8934019, at *6 (D. Md. Dec. 27, 2023) (bare statutory violation of Maryland wiretapping law not "sufficient to establish a concrete, albeit intangible, injury to privacy"); *Addi v. Int'l Bus. Machines, Inc.*, 2024 WL 2802863, at *4 (S.D.N.Y. May 31, 2024) (same); *Adams v. PSP Grp., LLC*, 691 F. Supp. 3d 1031, 1040-41 (E.D. Mo. 2023) (no standing for Missouri Wiretap Act claim where plaintiff had "not identified any specific information she disclosed that implicates a protectable privacy interest").

14

sf-5981056

## CERTIFICATE OF CONFERRAL

Pursuant to RMR Civ. Practice Standard 7.1B(b), Quantum met and conferred

with Plaintiffs via video call on July 11, 2024 regarding the substance of this motion.

The parties were not able to resolve their dispute.

Dated: July 15, 2024                    MORRISON & FOERSTER LLP

By:  */s/ Purvi G. Patel*
Purvi G. Patel
PPatel@mofo.com
Erik Manukyan
EManukyan@mofo.com
707 Wilshire Boulevard, Suite 6000
Los Angeles, California  90017-3543
Telephone:     213.892.5200
Facsimile:     213.892.5454

Elisabeth Hutchinson (CO SBN 46569)
EHutchinson@mofo.com
4200 Republic Plaza
370 Seventeenth Street
Denver, Colorado 80202-5638
Telephone:     303.592.1500
Facsimile:     303.592.1510

Elizabeth L. Arbatman
larbatman@mofo.com
425 Market Street
San Francisco, California 94105-2482
Telephone:     415.268.7000
Facsimile:     415.268.7522

**Attorneys for Defendant
Quantum Metric, Inc.**

i

sf-5981056

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2024, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of the filing to

opposing counsel:

Max S. Roberts
Mroberts@bursor.com

Philip L. Fraietta
pfraietta@bursor.com

Caroline C. Donovan
cdonovan@bursor.com

Dated: July 15, 2024                    MORRISON & FOERSTER LLP

By:   /s/ Purvi G. Patel
Purvi G. Patel
PPatel@mofo.com
Erik Manukyan
EManukyan@mofo.com
707 Wilshire Boulevard, Suite 6000
Los Angeles, California  90017-3543
Telephone:    213.892.5200
Facsimile:     213.892.5454

Elisabeth Hutchinson (CO SBN 46569)
EHutchinson@mofo.com
4200 Republic Plaza
370 Seventeenth Street
Denver, Colorado 80202-5638
Telephone:    303.592.1500
Facsimile:     303.592.1510

Elizabeth L. Arbatman
larbatman@mofo.com
425 Market Street
San Francisco, California 94105-2482
Telephone:    415.268.7000
Facsimile:     415.268.7522

***Attorneys for Defendant
Quantum Metric, Inc.***

ii

sf-5981056